GARRISON, Judge.
This is an appeal from a judgment of the district court cancelling defendants’ lease, *1114 ordering their eviction from the premises, ordering defendants to pay rent from January 1,1981 until possession is given to plaintiff, and awarding attorney’s fees to plaintiff. From that judgment, defendants appeal.
On or about April 17, 1980 plaintiff purchased the property “535 — 537 Julia Street” subject to a lease executed on April 27,1979 between the prior owners and defendants. The lease had a term of three years. On April 24, 1980 representatives of the Orleans Parish Sanitation Services (hereinafter OPSS) inspected the premises. Notice was mailed on April 29, 1980 and the premises were reinspected on June 3, 1980. On June 10, 1980 a representative of the OPSS executed affidavits in Municipal Court and both Historic Faubourg and the defendants were cited in violation of 828 MCS §§ 30-30, 30-28 and 30-35. After two continuances the trial judge found that health violations had occurred and a fine was levied but suspended as against Historic Faubourg.
On September 9, 1980 the Fire Department cited plaintiff for 21 violations of the Fire Code. On September 16,1980 plaintiff notified defendants that the New Orleans Fire Department had cited the premises and that defendants, under the terms of the lease, were responsible for correction of the violations within 30 days. On November 17, 1980 plaintiff notified the lessees that Historic Faubourg would seek judicial termination of the lease on a number of grounds, including failure to maintain the premises. The November 17 letter further stated that lessor would refuse to accept any further rent from the lessees. Suit was filed on December 23, 1980, seeking cancellation of the lease based upon, among other allegations, failure to maintain the premises.
On January 1, 1980 lessees tendered to lessor a check for the January rent. Lessor deposited the check to its Whitney Bank Account on January 5,1980. On January 6, 1980 lessor issued its check to lessees for the amount of the January 1 check.
Trial was held on January 16, 1981 and most of the evidence presented went to the issue of the condition of the premises. No testimony relative to the rent check was presented at trial, although the check was admitted into evidence as Exhibit G. On January 19 the trial court rendered judgment in favor of the lessor. On January 19 the trial court also granted a suspensive appeal from the judgment it had rendered that day.
On January 20, 1981 lessees deposited the Historic Faubourg check to their account. On February 2 the check was returned because the lessor had stopped payment on the check. On February 6 lessees filed a petition to annul the judgment on the basis of the check incident. An answer was filed on February 20 and the trial court dismissed the suit to annul on that same day.
The judgment on appeal is the judgment of January 19 which was based on plaintiff’s suit for termination of the lease based on health and sanitary conditions, failure to maintain the premises, and alleged illegal activities. At no time did plaintiff seek eviction based on a failure to pay the rent. On appeal, defendant-appellants seek to argue the issue of the check. This issue is not properly before the court. The major operative events of the check issue all occurred after the appeal was granted; the check issue was not addressed by the trial judge because it had not occurred, and there is no real evidence of this matter contained in the record. The sus-pensive appeal granted was from the January 19 judgment. Although defendants could have appealed the later judgment, they failed to do so. Accordingly, the check issue is not before this court and will not be addressed.
The lease contains several provisions relative to the instant appeal:
“Lessee is obligated not to use the premises for any purpose that is unlawful or that tends to injure or depreciate the property.
“The within leased premises and appurtenances, including the locks, keys, plumbing, and glass, elevator, and heating system, if any, and all other fixtures, are *1115 accepted by the Lessee in their present condition, except for such repairs and improvements as are written into this lease, and except such as may be needed to the roof or rendered necessary by fire or other casualty. The Lessee agrees to keep them in the same order as received, during the term of this lease; to pay all bills for water, including water sprinkler service charge, light, gas and other service, and to comply at the Lessee’s expense with all ordinances and laws, now existing, or to be enacted, and at the termination or cancellation of this lease to return the premises broom clean and free from trash, and in like good order as received by actual delivery of the keys to Lessor or Agent, the usual decay, wear and tear excepted.
******
“Lessee assumes the maintenance of the plumbing, including fixtures, outlets and drains, and the protection and repair of said plumbing, etc., even when injured by freeze.
***** Is
“Should the premises be vacated or abandoned by Lessee because of ejectment for breach hereof, or otherwise, or should the Lessee begin to remove personal property or goods to the prejudice of the Lessor’s lien, then the rent for the unexpired term, with Attorney’s fees, shall at once become due and exigible, and Lessor, at his option, has the right to cancel the lease, or re-enter and let said premises for such price and on such terms as may be immediately obtainable and apply the net amount realized to the payment of the rent.
******
“Lessee shall maintain inside and outside of premises in clean condition, up to normal standards required by City Health Department.”
It is apparent from both the Municipal Court conviction on Health violations and the 21 reported violations of the Fire Code that lessees not only have failed to comply with the normal standards of the City Health Department, but also have failed to maintain the property to an extent so as to cause injury to and depreciation of the property.
At trial the lessees produced several estimates for repairs to correct the violations, but no documentary evidence that the repairs had been made. Although Mr. Wim-pey testified that the repairs had been made, Paul Wright, a detective who spent the Sunday immediately preceding trial on the premises, testified to the following conditions:
“Q. And did you have occasion to count the number of beds in there?
“A. Yes, sir.
“Q. How many beds were there?
“A. Twenty-two, sir, in two bunk tier units.
“Q. And the beds, would you describe what they looked like, what was the first bunk bed, how far off the ground was the first one, the lower bunk bed?
“A. The front bed, I would say approximately six inches from the ground.
“Q. And the second level was how high up?
“A. Approximately four and a half to five feet, sir.
“Q. How many different people were in that room?
“A. When we arrived I was able to make out, I counted seven people that appeared to be sleeping in the area. Now, there was movement to and fro of people arriving, people going to the bathroom while we were there. And when we left at around midnight, there were approximately twenty people, certainly between eighteen and twenty.
“Q. In that one room?
“A. Yes, sir.
“Q. Would you describe the lighting in that room?
“A. Well, the lights were out the entire time we were there to begin with. So, there were provisions for two fluorescent lights, there were lighting strips shorter than these you have here. But it was the same tubing kind. In fact, I tried to turn one on but—
*1116 “Q. What happened when you went to turn the light on?
“A. Well, there was a pull cord arrangement to turn it on but when I pulled on it, in fact, the whole thing sank towards me, it gave a start. One didn’t light at all and the other one went into a sputtering kind of flashing, but didn’t fully ignite or light up. At this time, somebody who appeared to be sleeping told me quite politely and crudely not to turn the light on, but to turn it out.
“Q. He objected to your turning the lights on?
“A. Definitely. So, I pulled the cord again but it was very insecure, I didn’t want to try it again. I did not try the other unit at all.” (Tr. pp. 22-24)
* * * * * *
“Q. Would you describe to the Court the conditions of the toilet facilities?
“A. It is a toilet bowl with an accompanying sink tank. It is in a room for starters, it was completely surrounded by what I can only describe as a small lake which smelled to me to be of urine. In fact, I burned the pair of canvass shoes I was wearing.
“Q. You mean subsequently?
“A. Yes, subsequently. It smelled of urine, I had to wade through this to actually reach the bowl and the seat was in a down position which it had to be because it was broken in three places at least. And there was assorted feces lying on top of the seat. “There was also no light in there, there was a light bulb which traced back to the light switch, but it was not working.
“Q. You had no light at all?
“A. That is correct.
“Q. Was that the only toilet facility for that dormitory?
“A. Yes, sir, I covered all of the ground floor area.
“Q. There was only one door that you could go in or out of?
“A. Yes.
“Q. And twenty-two people were in there during the time you were in there?
“A. Yes, sir.” (Tr. pp. 24-26)
Lessor’s allegations that lessees allowed sales of controlled substances and prostitution on the premises remain unproved.
On appeal, the scope of appellate review is (1) whether the trial judge was manifestly erroneous in his factual determinations and (2) whether the trial judge committed an error of law.
We find that the trial judge committed no errors of fact or law. Under the terms of the lease, lessor had the right to termination for Health Department violations and the lessees, against whom a conviction has been taken, have failed to prove that any remedial steps or repairs have been completed. We note that the lease provides for attorney’s fees as awarded and that payment until the premises are vacated is proper.
For the reasons discussed, the judgment of the district court is affirmed.
AFFIRMED.